Margaret L. **KALSKETT**, Plaintiff,

v.

**LARSON MANUFACTURING COMPANY OF IOWA, INC., Defendant.**

**No. C99–3079 MWB.**

United States District Court,
N.D. Iowa,
Central Division.

June 1, 2001.

Mark D. Sherinian, Sherinian & Walker Law Firm, Des Moines, IA, for Plaintiff.

George E. Martin, Berens & Tate PC, Omaha, NE, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 965
 A. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 965
 B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 969

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 969
 A. Summary Judgment Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 969
 B. Kalskett's ADA Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 971
 1. Is Judicial Estoppel Appropriate as to Kalskett's Apparently
 Inconsistent Statements? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 972
 2. Was Kalskett qualified to perform the essential functions of her
 job? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 975
 a. team leader . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 975
 b. assembly line position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 978
 3. Other Positions that Kalskett Claim s She Was Entitled To . . . . . . . . . . 980
 4. Does the Direct Threat Defense Include Threats to One's Own
 Health and Safety? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 981
 C. Kalskett's State Law Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 987

## I. INTRODUCTION

This action involves allegations of employment discrimination on the basis of a disability brought by plaintiff Margaret L. Kalskett ("Kalskett") against her former employer defendant Larson Manufacturing Company of Iowa, Inc. ("Larson") under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Iowa Civil Rights Act of 1965 ("ICRA"). Larson has filed a Motion for Summary Judgment, seeking judgment as a matter of law on Kalskett's federal and state law claims.

### A. Factual Background

Kalskett was hired by Larson as a temporary worker on June 10, 1991. On or about February 17, 1992, Kalskett's employment status with Larson was changed from a temporary, non-benefitted employee to a full-time benefitted employee. Kalskett was employed by Larson between June 10, 1991, and September 11, 1998. Larson manufactures storm doors at two facilities in Lake Mills, Iowa. During the time that Kalskett was employed by Larson, she served in various positions on the assembly/production line as well as a team leader of an assembly line, known as Work Station # 3.

Kalskett suffered a back injury while working on the assembly/production line at Larson on December 4, 1995. She underwent surgery as a result of this injury in January of 1996. Kalskett returned to work in February of 1996, and was placed on light duty to accommodate her temporary restrictions during her recovery. During this time period, Kalskett had use of a conference room at Larson to perform stretching exercises that were recommended by her doctor. Thereafter, in the Spring of 1996, Kalskett was provided a release from her doctor which permitted her to try working in a regular production position. Larson permitted Kalskett to work wrapping windows, however, within an hour Kalskett approached her crew leader, Ron Kvale, and indicated that it was too soon for her to be wrapping windows. Kvale proceeded to ask Kalskett which positions she thought she could perform, and she listed the following three positions on the line that she believed she could perform: (1) screen assembly, (2) wiping screens, and (3) wiping master frames. Kvale arranged for Kalskett to

perform only those positions, and she rotated between them for a month to six weeks. At the end of that six week period, Kalskett went back to wrapping and screening, but by July these positions proved too much for her back. She returned to her doctor and he recommended that she take a two week leave of absence. When Kalskett returned from her leave of absence, she was assigned to the temporary light duty position of wiping down doors for a day. When she told her crew leader Bill Humphrey that wiping doors required too much leaning forward, she was allowed to place stickers on boxes as they came off the production line. Kalskett continued putting stickers on boxes as they came off the line for a period of two or three weeks, after which her back began to hurt. Kalskett visited her doctor who took an MRI of her back, and recommended that she take some time off. Thereafter, Kalskett returned to work with a release from her doctor outlining her new physical restrictions, which she presented to her crew leader Kvale. Kvale interacted with Kalskett to determine what positions she thought she could perform, and ultimately it was determined by both of them that Kalskett could work assembling screens, wiping screens, wiping frames, and caulking master frames. Kalskett worked assembling screens and caulking through the end of 1996. During this period, Larson accommodated Kalskett's pain management program by allowing her to come to work late so she could swim in the morning, and by allowing her to intermittently take time off during working hours to visit her doctors and attend physical therapy.

In early 1997, Kalskett was again briefly returned to regular duty by her doctor. Almost immediately upon her return, however, Kalskett re-aggravated her back and consequently had new and additional restrictions placed upon her by her doctor. To accommodate those new restrictions,

Larson allowed Kalskett to work solely at the screen assembly station and, further, changed that station from a one-person task to a two-person task, so that Kalskett would be required to perform only those functions within her restrictions. In early February of 1997, Kalskett was moved from helping only in screen assembly to performing several other individual stations on the production line. To determine which stations Kalskett could perform, Kalskett and her supervisor, Carol Bergo, worked to develop a customized rotation that Kalskett believed that she could perform. Kalskett proceeded to work in that customized rotation until May or June of 1997, at which time, she learned through an internal Larson job posting that the Team Leader position for Line 3—a training line—was vacant. In light of this job posting, Kalskett submitted a resume, interviewed with Carol Bergo, and was awarded the position.

In the early Fall of 1997, however, Kalskett's training line shut down due to a downturn in production demand, and Kalskett went back to working on Line 2 as a production line worker. When Kalskett went back to working on Line 2, she was performing at a limited number of stations, including wrapping, screening, and line feeding. Performing these duties, however, caused Kalskett's back to hurt to the point that she had to return to her doctor after only a few weeks of production work. In the Fall of 1997, Kalskett's doctor restricted her to working only a two hour rotation. Larson accommodated Kalskett by permitting her to work on Line 2 performing in only the wrapping, screening, boxing, and line feeding stations. Soon thereafter, however, Kalskett began experiencing back pain, and returned to her doctor, who, on March 31, 1998, gave Kalskett the following new restrictions: A maximum lifting restriction of twenty (20) pounds, and a ten (10) degree bending

limitation. Upon her return, Kalskett communicated these new restrictions to her supervisor Carol Bergo, and it was decided that Kalskett would be taken off the wrapping and screening stations in order to accommodate the new restrictions. Subsequently, Bergo arranged for Kalskett's duties to be reduced to the following three stations: (1) boxing, (2) line feeding, and (3) caulking, occasionally only. Despite these arrangements, Kalskett was still experiencing pain, which precipitated another visit to her doctor on April 6, 1998. At that visit, Kalskett's doctor created a more limiting set of restrictions for her, which consisted of the following: a twenty (20) pound lifting restriction, a ten (10) degree, three times per day bending restriction, a restriction that she not stand more than 50% of the workday, sit more than 50% of the workday, or push or pull more than twenty (20) pounds for over 50% of the workday. On April 7, 1998, Kalskett returned to Larson and presented this most recent set of restrictions to Carol Bergo, who in turn accommodated those restrictions by providing her with a light duty position at Larson's other facility in Lake Mills, Iowa, known as Classic View, from April 7, 1998 to April 9, 1998.

At Classic View, Kalskett taped plastic pieces to boxes, placed hinges dropped by a forklift back into a box, and assembled patio bags, which consisted of the warranties, screws, and other incidental parts that came with Larson's doors. On April 9, 1998, the manager of all of Larson's Lake Mills operations, Dan Beinhorn, met with Kalskett and told her that Larson had no more work that could accommodate her restrictions. During this meeting, Kalskett contends that Beinhorn promised her that he would return her to the position of team leader of the training line if that position ever became available. At the time Beinhorn allegedly made this statement to Kalskett, her non-permanent restrictions were the same as they had been

on April 7, 1998. So that possible accommodations could be explored further, Kalskett and Beinhorn agreed that she would revisit her doctor in order to determine her physical condition and restrictions, and to report her findings back to Beinhorn. On June 4, 1998, Kalskett returned to work and brought with her a release from her doctor that contained the following restrictions: Kalskett was permitted to return to limited duty, with a thirty (30)—forty (40) pound lifting restriction and an unspecified bending restriction. In light of this release, Carol Bergo secured a position that would accommodate Kalskett's restrictions, which entailed counting plastic window tops and springing the lifts. This position, however, was not a regular manufacturing position. Thereafter, on June 8, 1998, Kalskett was asked by her Team Leader, Tim Midlang, if she would like to try assembling screens. Kalskett accepted Midlang's offer, believing that she might be able to assemble screens because Larson had recently restructured the position so that it was more user friendly. Kalskett assembled screens for approximately one-half hour prior to the end of her shift that day, and on the next day, June 9, 1998, when she arrived for work, her back was in severe pain. As a result, Kalskett went back to counting out tops and springing lifts, but only worked for about two and one half hours in this temporary light duty position before approaching Carol Bergo to ask permission to go home and rest her back, because of the pain she was experiencing due to screening the previous day. Carol Bergo granted Kalskett's request to go home early. Shortly thereafter, when Kalskett visited her doctor's office, her back was so sore from attempting the screen assembly process that she was barely able to walk. After taking two weeks off from Larson to rest her back, Kalskett received another release to return to work from her doctor, which con-

tained the following restrictions: ten (10) pound lifting restriction, a repetitive lifting or carrying weight limit of 5–10 pounds, bending limit of 30 degrees, 3 to 4 times an hour, kneeling limitation of not more than 3 times per hour, and a pushing and pulling restriction of not more than 50% of work time. Eventually, these restrictions became permanent. On June 25, 1998, Kalskett brought her release back to Carol Bergo, whereupon the two had a discussion about the limitations imposed by these latest restrictions. During this discussion, Carol Bergo used a chart to demonstrate to Kalskett how slight a 30 degree bend is, and they discussed how limiting that restriction was since Kalskett was further restricted from bending in that manner more than three to four times an hour. They also discussed the light duty jobs that were available to Kalskett. Carol Bergo ultimately found a position for Kalskett based on her restrictions, which consisted of helping one of Larson's human resources managers, Bill Humphrey, with training sheets and catching up on orientation from June 25, 1998 to June 29, 1998. While helping Humphrey, Kalskett went through his files and pulled those regarding employees who no longer worked at Larson. She also updated training checklists, prepared paperwork for entry into Larson's computer system, and met with employees about safety issues related to their positions. Kalskett worked with Mr. Humphrey for three days.

On June 29, 1998, Kalskett was summoned to a meeting with Dan Beinhorn and Carol Bergo, during which Beinhorn told Kalskett that Humphrey was caught up on paperwork, and that there were no more tasks available that would accommodate her restrictions. In light of this meeting, Kalskett decided to visit with her doctor again, who, on July 13, 1998, made her previously imposed restrictions permanent. After visiting her doctor, and learning that her restrictions were permanent,

Kalskett returned to Larson and again had a meeting with Carol Bergo, wherein she presented Bergo with her permanent restrictions. After reviewing Kalskett's permanent restrictions, Carol Bergo told Kalskett that Larson had no positions that would accommodate her permanent restrictions. Kalskett indicated that she was hurt by Carol Bergo's statements, because she thought that Larson could have "invented" a new position for her. Shortly thereafter, Kalskett had another meeting with three representatives form Larson, including Dan Beinhorn, Janet Hebrink, Larson's insurance manager, and Jean Osthus, a human resources manager for Larson, during which Larson's short-term disability plan was explained to Kalskett. Following this meeting, on July 31, 1998, Kalskett met with Larson's occupational nurse, Dee Lackore, and discussed positions in the "primary" department and concluded that her restrictions would not permit Kalskett to perform any of them, with or without reasonable accommodation. Kalskett asked Lackore to notify her if there were any positions at Larson's facility in Brookings that Lackore thought could be created for her at Larson's Lake Mills facility.

Over Labor Day weekend in 1998, Kalskett received a call from one of her former coworkers who had heard that a new production line was being started. The new line, known as Line 3, was started because of the increased demand for product. Kalskett called Dan Beinhorn about the Team Leader position for the new line, and on October 22, 1998, Kalskett sent Beinhorn a letter asking whether she would be placed in the Team Leader position for the new line. At the time Kalskett wrote this letter, her employment with Larson had ended a month and one-half earlier, specifically on September 11, 1998. Beinhorn replied to Kalskett's letter the same day, indicating that he planned on

giving the Team Leader position to one of Larson's active Team Leaders. After Kalskett was not awarded the Team Leader position, she filed a charge with the Iowa Civil Rights Commission.

### B. Procedural Background

On October 22, 1999, Kalskett filed a complaint, in which she alleges that Larson discriminated against her on the basis of her disability in violation of the ADA and the ICRA. Specifically, Kalskett alleges that she suffers from chronic lower back problems that limit her ability to lift, bend, kneel, push and pull, and that on June 29, 1998, Larson "laid off" Kalskett because it claimed it did not have a position available for Kalskett which would accommodate her medical restrictions. On October 22, 1998, Kalskett alleges that she requested that she be considered for the position of Team Leader, which she claims she was capable of performing. However, Larson's plant manager, Dan Beinhorn, allegedly refused to consider Kalskett for the position of Team Leader because of her disability. Kalskett contends that Larson's failure to rehire her violated the ADA and the ICRA. Larson denies all of Kalskett's allegations.

On February 15, 2001, Larson filed its Motion for Summary Judgment, arguing that Kalskett is not a qualified individual under the ADA. Specifically, Larson contends that Kalskett cannot perform the essential functions of her job, with or without accommodation, that Kalskett never requested reasonable accommodation, that Larson is not required to delegate essential functions of the Team Leader position until Kalskett could perform the remaining tasks of that job, and further that employing Kalskett as a Team Leader would pose a significant risk to her health and safety. Larson also contends that it was not required to create a position for Kalskett, nor was it required to permanently assign her to light duty positions. For these reasons, which the court will flush out more thoroughly below, Larson contends that it is entitled to judgment as a matter of law. In response, Kalskett contends that she is a qualified individual with a disability, that the accommodations that she requested were reasonable under the ADA, and that any risk to her health and safety is not a defense to a claim under the ADA. Accordingly, Kalskett contends that Larson's summary judgment motion should be denied in its entirety.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after

the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party

fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

■ Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford*); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford*); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir.1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990));

*Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford*); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford,* 37 F.3d at 1341); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford,* 37 F.3d at 1341); *Johnson,* 931 F.2d at 1244.

■ However, the Eighth Circuit Court of Appeals has also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford,* 37 F.3d at 1341, the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir. 1995) (citing *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134 (8th Cir.1999) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied,* 528 U.S. 818, 120 S.Ct. 59, 145

L.Ed.2d 51 (1999). Furthermore, "[s]ummary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her [or his] claim." *Snow,* 128 F.3d at 1205; *accord Helfter,* 115 F.3d at 615; *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995). With these standards in mind, the court turns to consideration of Larson's Motion for Summary Judgment on Kalskett's disability discrimination claims.

### B. *Kalskett's ADA Claim*

■ The ADA affords protection from discrimination to any "qualified individual with a disability." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, Kalskett must show (1) that she has a disability within the meaning of the ADA, (2) that she is qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) that she suffered an adverse employment action because of her disability. *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1087 (8th Cir.2001) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)); *Heaser v. Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001); *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 678 (8th Cir.2001); *Treanor v. MCI Telecomm. Corp.,* 200 F.3d 570, 574 (8th Cir.2000); *Cravens v. Blue Cross and Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir.2000). The ADA further defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]...." 42 U.S.C. § 12112(b)(5)(A). The proof necessary for discrimination cases is flexible and varies with the specific facts of each case. *Young v. Warner–Jenkinson*

*Co., Inc.,* 152 F.3d 1018, 1022 (8th Cir. 1998). Here, Kalskett has set forth a failure-to-accommodate disability discrimination claim against Larson.

Larson, however, argues that Kalskett's ADA claim fails for several reasons. First, Larson argues that Kalskett's position in this lawsuit that, she was able to work on the production line, is inconsistent with the answers she provided in a questionnaire prepared by the Iowa Civil Rights Commission and to specific interrogatories, in which Kalskett represented that she was unable to perform production jobs on the line or other departments at Larson, and that Kalskett has failed to offer an adequate explanation for this apparent inconsistency. Second, Larson argues that Kalskett cannot establish any of the *prima facie* elements of her ADA claim, and, consequently, summary judgment is appropriate. The court addresses each of Larson's arguments in turn.

### 1. Is Judicial Estoppel Appropriate as to Kalskett's Apparently Inconsistent Statements?

■ When an ADA plaintiff declares in a prior sworn statement that she is unable to work and later pursues an ADA claim asserting that she can work, she is obligated to set forth an adequate explanation for the apparent inconsistency between the two positions, otherwise she will be estopped from maintaining the inconsistent position. *See Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). Specifically, in *Cleveland,* the Supreme Court stated:

When faced with a plaintiff's previous sworn statement asserting "total disabil-

ity" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807, 119 S.Ct. 1597; *see also Lloyd v. Hardin County, Iowa,* 207 F.3d 1080, 1083 n. 3 (8th Cir.2000) (citing *Cleveland*).

■ Larson identifies two sworn statements which it believes contradicts Kalskett's current position that she is able to work on the production line. The first sworn[1] statement was made to the Iowa Civil Rights Commission during the administrative stage of this proceeding, in which Kalskett completed a questionnaire, which contained the following question: "What job duties could you not perform? Be specific." Kalskett provided the following answer: "I was unable to be in production jobs on the line or other departments." The second sworn statement was made in response to the following interrogatory propounded by Larson to Kalskett: "List each and every position, job or duty you allege that you could have performed at Defendant's Company with reasonable accommodation." Kalskett provided the following response:

I could have been utilized as a trainer because I could take the trainee to observe the job being performed by an experienced person while explaining the procedure. When it came time for

---

1. The court will assume without deciding that the written answers that Kalskett provided in the Iowa Civil Rights Commission's Questionnaire, which were made during an administrative setting, are sworn statements. This is so because Kalskett does not argue otherwise, and as will be discussed, the court finds that Kalskett has sufficiently explained the apparent inconsistencies between her statements.

hands on by the trainee, they would be able to perform the necessary lifting and movements while I observed and "walked" them through the job.

I could have been utilized in the inventory part of the Larson Manufacturing especially in Classic View. At the time I was there they had a major problem with what parts were in-house and what parts were in transit. Sometimes they would have to stop the line and change over to another style of door because they would be missing one item to complete the style of door they were working on. This caused a lot of stress for the employees when trying to meet the schedule and did cause them to have to work a lot of overtime because of not meeting the schedule.

I could have been a Team Leader because this position was to be a management and supervisory position. The Team Leader's job was to supervise the workers and anticipate any problems or difficulties performing certain tasks they might have.

These positions would have been within my restrictions.

In light of these prior statements made by Kalskett, Larson contends that Kalskett's current position that she is able to work on the production line, and perform the essential functions of such a job, is untenable. Kalskett, however, maintains that these prior statements can be explained based upon her knowledge at the time they were made. *See Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597 (requiring plaintiff to proffer an explanation of any apparent inconsistency with the necessary elements of an ADA claim). Specifically, Kalskett proffers the following explanation:

In my answers to the Iowa Civil Rights Commission and my answers to the interrogatories in this case, I indicated that I did not believe I could perform positions on the assembly line. At the time that I gave those answers, I was not aware that the plant had changed to a two-hour rotation. After I learned of the two-hour rotation, had an opportunity to view the operations plant with Clark Williams and learned from him what minor modifications to the job might prevent further aggravation of my back condition, I came to believe that I could perform the positions of caulking, screening and wraparound.

*See* Plaintiff's Exhibit D at ¶ 5. Because Larson had changed from a four-hour rotation to a two-hour rotation in the Fall of 1998, Kalskett believed that there were positions that she could perform on the assembly/production line. Kalskett also explains that, in the Fall of 1997, her doctor advised her to operate on a two-hour rotation schedule. In light of this recommendation, Kalskett approached her supervisor, Tim Midlang, and requested that she be allowed to operate on a two-hour schedule. Kalskett maintains that although Midlang acknowledged her request, Midlang did not enforce it, and that therefore she was forced to rely on the voluntary cooperation of other assembly/production line workers for help, which Kalskett argues did not occur. Thus, Kalskett believes that since the entire Larson production/assembly line now operates under a two-hour rotation, she will be able to work on Larson's assembly/production line.

As the Supreme Court in *Cleveland* made clear, the pertinent inquiry for the court here is whether Kalskett has set forth an explanation that is "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597. The court concludes that Kalskett has proffered a sufficient explanation

to defeat summary judgment here. This is so because the court finds that Kalskett's explanation is sufficient to warrant a reasonable juror's concluding, that assuming the truth, of Kalskett's good faith belief in the fact that she was unable to work on Larson's assembly line while it operated on a four-hour rotation schedule, Kalskett has generated a genuine issue of material fact that she could work on the assembly/production line while it operated on a two-hour rotation schedule.

Larson contends that Kalskett's explanation is inadequate, because Larson submits that Kalskett was already on a two-hour rotation per her doctor's restrictions from the Fall of 1997 onward, irrespective of the four-hour rotation that the rest of the personnel at Larson were on. Moreover, as to Kalskett's contention that her supervisor at Larson, Tim Midlang, refused to enforce her two-hour restrictions, Larson argues that such contention is contrary to sworn admissions she made during her deposition on February 16, 2001. Consequently, Larson argues that Kalskett's explanation is legally insignificant under *Cleveland.* The court, however, directs Larson's attention to Kalskett's response to Interrogatory No. 14, which was made on May 24, 2000, in which Kalskett stated:

In the course of seeing Dr. Lester, I found it difficult to follow my restrictions because of the lack of cooperation within the rotation set up on Line 2. I was supposed to be on a 2–hour rotation and they scheduled the line with a 4–hour rotation. I was told by Tim Midlang to find a person that would be my "buddy" and work with me. My co-workers were not willing to help me and would only do so if management had forced them to, which they did not.

*See* Plaintiff's Exhibit B. Thus, there is support in the record that Larson didn't enforce the two-hour rotation schedule, as Kalskett avers. Although Larson denies that Midlang ever forced Kalskett to work in a capacity that violated her two-hour rotation restrictions, these arguments go to the weight of the evidence, and weighing of the evidence is a task for the factfinder. *See Quick,* 90 F.3d at 1376–77 (explaining that the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial). Therefore, the court concludes that Kalskett has offered a sufficient explanation to defeat summary judgment here.[2]

2. The court notes that originally Larson argued that Kalskett's prior sworn statements should be discarded under the rules set out in *Canfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir.1983). However, later in its reply brief Larson argued that Kalskett's prior sworn statements should be discarded under the rules set out in *Cleveland.* In *Cleveland,* the Supreme Court explained the difference between its holding and the holdings of the circuit courts, specifically citing the *Canfield* decision, as follows:

They [the lower courts] have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statements (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity .... Although these cases for the most part involve purely factual contradictions (as to which we do not necessarily endorse these cases, but leave the law as we found it), we believe that a similar insistence upon explanation is warranted here, where the conflict involves a legal conclusion.

*Cleveland,* 526 U.S. at 804–07, 119 S.Ct. at 1603–04 (internal citations omitted). This court finds that Kalskett's prior sworn statements are most accurately characterized as legal conclusions, and thus, this court analyzed these statements here accordingly.

### 2. Was Kalskett qualified to perform the essential functions of her job?

As stated earlier, to state a *prima facie* case of failure-to-accommodate disability discrimination, Kalskett must demonstrate: (1) that she has a disability within the meaning of the ADA, (2) that she is qualified to perform the essential functions of her job, with or without accommodation, and (3) that she suffered an adverse employment action because of her disability. *See Kiel,* 169 F.3d at 1135. It is undisputed that Kalskett is disabled within the meaning of the ADA. Thus, the question becomes whether Kalskett was qualified to perform the essential functions of her job with or without reasonable accommodation. Kalskett contends that she has generated a genuine issue of material fact as to whether she is a "qualified" individual with a disability with respect to the following two positions at Larson: (1) team leader, and (2) assembly/production line worker.

■■■■■ To be a qualified individual within the meaning of the ADA, Kalskett must (1) possess the requisite skill, education, experience, and training for her position; and (2) be able to perform the essential job functions, with or without reasonable accommodation. *Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 786–87 (8th Cir.1998). "Although an ADA plaintiff retains the ultimate burden of proving that she is a qualified individual, an employer who disputes the plaintiff's claim that she can perform the essential functions of a job must put forth evidence establishing those functions." *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1113 (8th Cir.1995). An essential function may be established by evidence that includes:

(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Moritz,* 147 F.3d at 787 (internal quotation marks omitted). A plaintiff need only make a facial showing that a reasonable accommodation that would enable her to perform her essential job functions is possible. *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 950 (8th Cir.1999). The burden then shifts to the employer to show that it is unable to accommodate the plaintiff. *Id.* An employer is not required to "accommodate" a disabled employee by eliminating essential functions of the employee's job. *Id.* (stating that an employer is not required to reallocate or eliminate essential functions of a job to accommodate a disabled employee).

#### a. team leader

Kalskett contends that she was qualified for the position of team leader by her experience and training, and further that she would have been able to perform the essential job functions of team leader with reasonable accommodation. Larson, however, contends that the court need not even determine whether Kalskett has generated a genuine issue of material fact as to whether she was qualified for the position of team leader, because Larson asserts that it is undisputed that the team leader position Kalskett maintains she was entitled to under the ADA was never vacant during the time in question.

Notwithstanding, even if this court analyzed Kalskett's prior sworn statements under the rules set out in *Camfield,* this court would find that Kalskett did not create a "sham" issue by contradicting her prior statements in light of her explanation discussed above. *Camfield,* 719 F.2d at 1365–66.

■■■■ Reasonable accommodations may include "job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9) (emphasis added). "By terms of the statute, therefore, the existing position must be vacant." *Cravens,* 214 F.3d at 1019 (citations omitted). "The term 'vacant position' not only includes positions that are presently vacant, but also those that the employer reasonably anticipates 'will become vacant in a short period of time.'" *Id.* at 1019 n. 5 (citing *Monette*); *see also Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1187 (6th Cir. 1996) ("If, perhaps, an employer knows that a position for which the disabled applicant is qualified will become vacant in a short period of time, the employer may be required to offer the position to the employee."); EEOC Guidance, at 39 (" 'Vacant' means that the position is available when the employee asks for reasonable accommodation, or that the employer knows that it will become available within a reasonable amount of time."). In *Boykin v. ATC/VanCom of Colorado. L.P.,* 247 F.3d 1061 (10th Cir.2001), the Tenth Circuit Court of Appeals explained:

> Employers should reassign an employee to a position if it becomes "vacant within a reasonable amount of time." 29 C.F.R. pt. 1630, App. § 1630.2(*o*) (2000). The determination of what comprises a "reasonable amount of time" is to be made on a case-by-case basis and is to "be determined in light of the totality of the circumstances." *Id.* For example, if the employer "knows that an equivalent position for which the individual is qualified will become vacant next week[,] ... the employer should reassign the indi-

vidual to the position when it becomes available." *Id.* A period of thirty-seven days has been held to be a "reasonable amount of time." *Monette,* 90 F.3d at 1176, 1187 (employer acted within parameters of ADA in keeping employee on unpaid leave for thirty-seven days before terminating him when no new position opened).

*Boykin,* 247 F.3d at 1064–65. Additionally, because "[t]he disabled employee must be seeking an existing position within the company; the employer is not required to create a new position as an accommodation." *Cravens,* 214 F.3d at 1019 (citation omitted). Therefore, "an employer is not required to 'bump' another employee in order to reassign a disabled employee to that position." *Id.* (citations omitted). It is the plaintiff who bears the burden of showing that a vacant position exists and that she is qualified for that position. *Ozlowski v. Henderson,* 237 F.3d 837, 840 (7th Cir.2001) (citations omitted).

■■ It is undisputed that Kalskett became aware of the alleged vacant position as a team leader for Line 3 over the Labor Day weekend in 1998, when she received a phone call from one of her former co-workers who had heard that a new production line was being started. Larson acknowledged that it was indeed starting a new assembly line known as Line 3 because of its changing production demands, and that it was undergoing a reorganization to address those demands. Kalskett admits that she did not know why Line 3 would be starting. To buttress its argument that the team leader position of Line 3 was never vacant, Larson submitted the affidavit of its plant manager, in which he explains:

> Over a year later, in the fall of 1998, customer demand for product increased once again, to the point that a third

production line had to be established at the new plant.

At this same time, the Classic View plant was being reorganized so that instead of having two small production lines, it would have one, larger line.

Because these events coincided, it was decided that the equipment and personnel that would be idled by the reorganization at Classic View would simply move to the new plant, to form the third production line there.

As part of that transfer, it was determined that one Team Leader from Classic View would be required to take over the third production line being established at the new plant.

Of the four active Team Leaders at Classic View, it was further determined that Wendy Skellenger would be the best fit for the third production line being established at the new plant.

No new Team Leaders were hired as a result of this reorganization, no Team Leader position became open as a result of this reorganization, and no one outside of the four active Team Leaders was considered for the Team Leader position of the third production line being established at the new plant.

*See* Affidavit of Daniel L. Beinhorn. Larson asserts that the reorganization involved the physical movement of a production line from the Classic View facility to the main plant, and that the personnel in that production line, including the team leader, remained constant. Therefore, because the team leader position for the relocated line would be held by one of Larson's active team leaders, Larson argues that there was no team leader position for which Kalskett should or could have been considered. In an effort to ostensibly demonstrate that the team leader position of Line 3 was vacant, Kalskett asserts that Wendy Skellenger was offered the position of team leader for Line 3 in September of 1998, and that she was not required to take the position, but was given the choice to accept it or reject it. Additionally, Kalskett contends that the Classic View assembly line was expanding and that Larson added several crew leaders in the Fall of 1998.

The court is not persuaded that the team leader position of Line 3 was at any time vacant. The mere fact that Wendy Skellenger was given a choice as to whether she wanted the team leader position of Line 3 does not generate a genuine issue of fact that this position was ever vacant. This is so because Kalskett has not offered a shred of evidence refuting Larson's allegation that had Wendy Skellenger not taken the team leader position of Line 3, one of the other active team leaders would have been placed in that position. Larson maintains that no one outside of the four active team leaders was going to be considered for the team leader position of Line 3. To require Larson to consider Kalskett for that position when it was not vacant is contrary to the ADA. Indeed, if this court were to require Larson to consider Kalskett for that position, Larson would be required to bump one of its active team leaders from their position as an accommodation for Kalskett. Under the ADA, Larson is not required to do this. *See Cravens*, 214 F.3d at 1019 ("Thus, an employer is not required to 'bump' another employee in order to reassign a disabled employee to that position.") (citing *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995)); *see also Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir.2000) (stating that the ADA does not obligate employers to "bump" other employees or to create new positions); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174–75 (10th Cir.1999) ("[I]t is not reasonable to require an employer to bump another employee in order to reassign a disabled employee."). Here, because the position of team leader for

Line 3 was not vacant, and because Kalskett has failed to even generate a factual dispute that this position was vacant, Kalskett cannot request reassignment to this position as an accommodation under the ADA. *See Ozlowski,* 237 F.3d at 840 (explaining that it is the plaintiff who bears the burden of showing that a vacant position exists).

■ Kalskett also contends that Larson added several crew leaders in the Fall of 1998. Although Kalskett never explicitly makes the argument that she should have been reassigned to those positions as an accommodation, the court will nonetheless address such an argument as if it had been made here. Wendy Skellenger did testify that Larson added crew leaders, however, she also indicated that it took approximately a year or a little longer from the time that she left Line 3 that Larson had all the crew leaders in place. She further testified that this period would have been between late 1998 through 1999. As Larson points out, Kalskett's last day as an employee of Larson was September 11, 1998. Moreover, Wendy Skellenger testified that Line 3 did not start up until some-time in November of 1998[3], and thus Wendy Skellenger's testimony concerning when Larson added crew leaders would had to have occurred by November of 1998, at the earliest, or more likely by December of 1998. Regardless, a two month time period would have elapsed between Kalskett's last day and the time that Larson began adding crew leaders. Significantly, moreover, Kalskett has offered no evidence that Larson had even contemplated hiring additional crew leaders at the time her employment with Larson ceased. *See Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1187 (6th Cir.1996) ("If, perhaps, an employer knows that a

position for which the disabled applicant is qualified will become vacant in a short period of time, the employer may be required to offer the position to the employee."). Therefore, the court finds that Kalskett has failed to generate a genuine issue of material fact that reassignment to the crew leader positions that were added in late 1998 through 1999 was a reasonable accommodation under the ADA, because these positions were not vacant when Kalskett left Larson, and there is no evidence to suggest that Larson anticipated that these positions would become vacant. As a result, because these positions were not vacant, the court need not determine whether Kalskett was a qualified individual under the ADA with respect to these positions.

### b. assembly line position

■ Kalskett also contends that she has generated a genuine issue of material fact that she can perform the essential job functions of an assembly line worker with reasonable accommodation. Kalskett maintains that she could perform manual labor on the assembly line in two-hour increments, and specifically that there are two and maybe three positions that she could perform on the assembly line, including screening, caulking and wraparound. Larson, however, argues that there are more than a dozen positions on the assembly line at Larson and that it is the company's policy to rotate assembly line employees through as many positions as possible in a given day. Additionally, Larson argues that it is not required by the ADA to permanently disrupt a rotation system in order to provide an employee with a single light duty task. Lastly, Larson argues that even if it was required to provide

---

**3.** Dan Beinhorn submitted an affidavit that production on Line 3 did not commence until December of 1998.

Kalskett with her own three-position rotation, Kalskett's inability to perform production jobs of any kind would have prevented it from doing so.

As indicated previously, to be qualified under the ADA, Kalskett must (1) possess the requisite skill, education, experience, and training for her position; and (2) be able to perform the essential job functions, with or without reasonable accommodation. *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 786–87 (8th Cir.1998). With respect to the first prong, the court finds that Kalskett has generated a genuine issue of material fact as to whether she possesses the requisite skill, education, and training for an assembly line position. Kalskett worked at Larson for over seven years and worked on the assembly line before she injured her back from approximately 1991–1995. Additionally, Kalskett submitted her work evaluation from December of 1997 which indicated that she "completely understands all aspects of the job." *See* Plaintiff's Exhibit C at 3. Furthermore, the court notes that Larson has failed to submit any evidence indicating that Kalskett does not possess the requisite skill, education, and training for an assembly line position. With respect to the second prong, the court finds that Kalskett has also generated a genuine issue of material fact as to whether she could perform the essential functions of the assembly line job with reasonable accommodation in light of Larson's decision to implement a two-hour rotation schedule. This is so because in addition to Kalskett's own testimony, she has submitted evidence from Clark Williams, a rehabilitation consultant, in which he opines that with minor ergonomic modifications Kalskett could perform jobs on the production line based on a two-hour rotation schedule, and from her doctor, Carl O. Lester, in which he opines that there were jobs on the production line that Kalskett could perform.

Larson, however, argues that merely working on some positions on the production line is not performing the essential functions of the assembly/production line position. Specifically, Larson maintains that it is the company's policy to rotate assembly line employees through as many positions as possible in a given day, and that it is not required by the ADA to permanently disrupt a rotation system in order to provide an employee with a single light duty task. Kalskett contends that Larson's treatment of other disabled employees belie these arguments, and further that whether an essential function of an assembly line position at Larson entails rotating among all of the twelve positions on the assembly line is a question for the trier of fact. In support of her contentions, Kalskett points out that Phillip Huston is an employee of Larson who has been working on the assembly line only in the position of keys and latches. Huston states that this is a light duty position, that he does not rotate with any of the other positions on the assembly line and that he has been doing this since April 13th of last year. Kalskett also points out that due to his injury, Martin D. Jutting has been rotating between the side rails position and the packager position since November of 2000, and that Debra Mitchell, also an employee on the assembly line who sustained a shoulder injury, indicated that she has been on light duty since April of 2000. Mitchell stated that she rotates between the following positions, three of which are on the assembly line, at Larson four times a day: mortise machine, putting drip candy expanders in the door, screens in the door, and running the packager. Larson, however, contends that the individuals with whom Kalskett compares herself, identified above, are all either employees who have no permanent restrictions, or whose restrictions did not prevent them from being accommodated under the ADA.

Larson contends that Kalskett has failed to establish that she was treated disparately under Larson's system or that Larson has a past pattern or practice of creating permanent light duty work for its permanently impaired employees. The court disagrees with Larson, and concludes that Kalskett has generated a genuine issue of fact as to whether she was treated disparately under Larson's system and whether Larson has a past pattern or practice of creating permanent light duty work for its permanently impaired employees. Additionally, whether the essential job functions of an assembly/production line worker at Larson required Kalskett to rotate among all the positions on the production line is a question for the trier of fact. Thus, Larson is not entitled to summary judgment on this claim.

### 3. Other Positions that Kalskett Claims She Was Entitled To

Kalskett next argues that Larson failed to accommodate her by reassigning her to other positions that she argues either existed at the time of her termination or that became available shortly after her termination. Kalskett identified three positions, including trainer, assistant to the trainer, and the position of inventory control, in which she contends she could have been placed. However, Larson argues that of these three positions, the trainer position was never vacant, the position of assistant to the trainer never existed, and the position of inventory control was not even created until well after Kalskett's last day of work. The court addresses each of these alleged positions in turn.

■ First, Kalskett argues that she should have been accommodated by reassignment to the position of trainer. It is undisputed that William Humphrey continuously occupied the training position at Larson since late 1997. Merely because Kalskett believed that such a position was ideal in light of her restrictions does not require Larson to create another trainer position, see Cravens, 214 F.3d at 1019 (stating that "the disabled employee must be seeking an existing position within the company; the employer is not required to create a new position as an accommodation"), nor does it require Larson to bump Humphrey from his position as trainer and award it to Kalskett as an accommodation, see id. (stating that "an employer is not required to 'bump' another employee in order to reassign a disabled employee to that position"). Thus, the court agrees with Larson that Kalskett's argument that she could have performed the trainer position is of little value, because such position was never open.

Second, Kalskett argues that she should have been accommodated by reassignment to the position of assistant trainer. Larson argues that there was no such position at the time that Kalskett left Larson's employment, and that while Kalskett was assigned to assist Humphrey from June 25, 1998 to June 29, 1998, such assignment was only temporary. Larson unequivocally maintains that there was no such position available. On the other hand, Kalskett contends that there is an obvious need for such a position, and that Humphrey expressed the need for her continued assistance. Even assuming that Humphrey did make such a comment to Kalskett, Larson is not required to create such a position in order to accommodate her disability. Humphrey testified that he never had an assistant, and without any evidence in the record indicating that the position of assistant trainer was, in fact, a position at Larson, the court finds no merit in Kalskett's argument that she be accommodated by requiring Larson to create a position for her.

Third, Kalskett argues that she should have been accommodated by reassignment

to the position of inventory control. Kalskett asserts that she had a conversation with a Larson supervisor, Jim Sletten, when she interviewed for the position of team leader in May of 1998, during which Mr. Sletten indicated that Larson was creating a new position that would track inventory. Larson, however, points out that this new inventory control position was not created until February 8, 1999, which was seven months after Kalskett's last day of employment with Larson, and nine months after Mr. Sletten mentioned the position to Kalskett.

As this court indicated previously, under the ADA, employers should reassign an employee to a position if it becomes "vacant within a reasonable amount of time." 29 C.F.R. pt. 1630, App. § 1630.2(o) ("As an example, suppose there is no vacant position available at the time that an individual with a disability requests reassignment as a reasonable accommodation. The employer, however, knows that an equivalent position for which the individual is qualified, will become vacant next week. Under these circumstances, the employer should reassign the individual to the position when it becomes available."). "The determination of what constitutes a 'reasonable amount of time' is to be made on a case-by-case basis and is to be determined in light of the totality of the circumstances." *Boykin*, 247 F.3d at 1065.

 However, the Tenth Circuit Court of Appeals and other courts have held that employers are not obligated to retain a disabled employee on unpaid leave indefinitely or for an excessive amount of time. *See Taylor v. Pepsi–Cola Co.*, 196 F.3d 1106, 1110 (10th Cir.1999) (keeping plaintiff on indefinite leave unreasonable accommodation where he had informed employer he "could not advise when and under what conditions he could return to any work"); *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir.

2000) (unreasonable to require employer to assign employee to new position that became available "well over a year" after employer became aware of disability); *Kiphart v. Saturn Corp.*, 74 F.Supp.2d 769, 782 (M.D.Tenn.1999) (as a matter of law, the 1,300 days employer sought new position was "well in excess of the reasonable amount of time required by the ADA"); *Scheer v. City of Cedar Rapids*, 956 F.Supp. 1496, 1501–02 (N.D.Iowa 1997) (request that position be kept open indefinitely until plaintiff had been seizure-free for six months was not reasonable accommodation). Also, the EEOC's "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act," suggests that six months is beyond a "reasonable amount of time." 1999 WL 33103142, at *21 (Mar. 1, 1999).

Here, seven months had passed from the time that Kalskett's employment with Larson had ceased to the time that Larson created the inventory control position. The court concludes that seven months constitutes an excessive amount of time in which to require an employer to retain a disabled employee on unpaid leave. Accordingly, the court finds that requiring Larson to retain Kalskett for seven months on unpaid leave until the inventory control position became available is not a reasonable accommodation under the ADA.

### 4. Does the Direct Threat Defense Include Threats to One's Own Health and Safety?

Larson maintains that Kalskett's risk of injury to herself is a defense under the ADA, asserting that employing Kalskett in any type of production capacity position would incur significant risk that she would further re-injure herself. In contrast, Kalskett argues that Larson cannot assert as

a defense any potential risk to Kalskett's health and safety, because allowing Larson to assert this defense would allow an employer to play the paternalistic role of determining which health risks are acceptable to an employee and which are not, which is contrary to the ADA.

■ Thus, the question before this court is whether the "direct threat" defense includes threats to Kalskett's own health or safety. The court concludes that the question of risk of injury to Kalskett is a matter of "qualification," that is, ability to perform the essential functions of the job, and hence an element of the claim, rather than a defense of "direct threat" of injury to oneself. This is so because the plain language of the statutes authorizing the defense of "direct threat" to others, 42 U.S.C. § 12111(3)[4], § 12113(b)[5], do not authorize the defense of "direct threat" to oneself. *See Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063, 1067 (9th Cir.2000) (concluding that the language of the direct threat defense plainly does not include threats to the disabled individual himself).

Even the defense of "direct threat" to oneself is not authorized in the more general subsection preceding the one specifically authorizing the defense, namely 42 U.S.C. § 12113(a)[6]. Rather, reference to the defense of direct threat to oneself emanates from the EEOC's regulation 29 C.F.R. § 1630.2(r)[7]. Because the defense of direct threat to oneself is not authorized by the statute, this court agrees with the district court's finding in *Kohnke v. Delta Airlines, Inc.*, 932 F.Supp. 1110 (N.D.Ill. 1996), that the regulation impermissibly expands the statute.

Larson, however, argues that it can assert the defense of direct threat to oneself and relies on a decision by the Eighth Circuit Court of Appeals, namely *Lloyd v. Hardin County, Iowa*, 207 F.3d 1080 (8th Cir.2000). In that case, the Eighth Circuit Court of Appeals noted the following:

> The district court addressed Hardin County's argument that Lloyd was not, as a matter of law, a "qualified individual with a disability" because his disability posed a "direct threat" to the health

---

4. The definitions section of Title I of the ADA reads in relevant part:
 (3) Direct threat
 The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.
 42 U.S.C. § 12111(3).

5. The defenses section of Title I of the ADA reads in relevant part:
 (b) Qualification standards
 The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.
 42 U.S.C. § 12113. Although the subsection that sets forth the "direct threat" language does not explicitly set forth an affirmative defense to a claim of disability discrimination, it is clear that Congress intended the provision to define the terms of such defense. *See Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063, 1066 n. 2 (9th Cir.2000).

6. The defenses section of Title I of the ADA reads in relevant part:

 (a) In general
 It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

7. The EEOC regulations state that "Direct Threat means a significant *risk of substantial harm to the health or safety of the individual or others* that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (emphasis added).

or safety of himself or others. *See* 42 U.S.C. § 12113(b). The district court reasoned, based upon the absence of medical or other objective evidence in the record, that Hardin County was not entitled to summary judgment on that particular basis. *See* slip op. 8–9 (quoting 29 C.F.R. § 1630.2) (determination of whether an individual poses a "direct threat" to himself or others under 42 U.S.C. § 12113(b) "shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence.").

*Id.* at 1083. As this passage indicates, the district court concluded that Hardin County was not entitled to summary judgment on that particular basis, therefore, the Eighth Circuit Court of Appeals was not presented with, nor did it answer, the question whether the "direct threat" defense includes threats to one's own health or safety. Rather, the Eighth Circuit Court of Appeals merely reiterated the findings made by the district court, and did not affirm the district court on this particular finding as Larson contends. Notwithstanding, the court is aware that several cases do state that the direct threat defense includes threats to oneself,

see *LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832 (11th Cir.1998); *EEOC v. Amego, Inc.,* 110 F.3d 135 (1st Cir.1997); *Daugherty v. City of El Paso,* 56 F.3d 695 (5th Cir.1995), however, these cases do so only in *dicta.* Upon review, it appears that only the Eleventh Circuit Court of Appeals and the Tenth Circuit Court of Appeals have held that the defense encompasses such threats, *see Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996) and *Borgialli v. Thunder Basin Coal Co.,* 235 F.3d 1284, 1290 (10th Cir.2000), however, these decisions provide this court with essentially no guidance because they give virtually no explanation for their holdings.[8] Instead, both cases simply assert, without analysis, that the ADA's direct threat defense applies to threats to the disabled individual himself/herself.

The Ninth Circuit Court of Appeals, however, was squarely presented with this question, and concluded that the language of the direct threat defense did not include threats to the disabled individual herself/himself. *See Echazabal v. Chevron USA, Inc.,* 226 F.3d 1063, 1067 (9th Cir. 2000).[9] Specifically, the *Echazabal* court reasoned:

> In order to resolve the scope of the direct threat defense, we turn first to the language of [the] provision itself. Here, that language is dispositive. The

---

8. In *Borgialli,* the Tenth Circuit Court of Appeals, without comment, states that 29 C.F.R. § 1630.2(r) expands upon the issue of "direct threat" as the term appears in 42 U.S.C. § 12111(3). *But see Echazabal,* 226 F.3d at 1068 (explaining that because the language of the direct threat defense plainly expresses Congress's intent to include within the scope of a § 12113 defense only threats to other individuals in the workplace, the court rejects the EEOC's regulatory interpretation, 29 C.F.R. § 1630.2(r), of the statutory "direct threat" provision); *Kohnke,* 932 F.Supp. at 1111 (stating that the EEOC's interpretation

of the "direct threat" language in the ADA is untenable, because it renders certain words in the ADA meaningless, and thus must be rejected since a court should not construe a statute in a way that makes words or phrases meaningless, redundant or superfluous) (citations and internal quotations omitted).

9. In a footnote, the Ninth Circuit Court of Appeals recognized the district court's decision in *Kohnke v. Delta Airlines, Inc.,* 932 F.Supp. 1110 (N.D.Ill.1996), wherein it concluded that the direct threat defense does not apply to threats to oneself.

direct threat defense permits employers to impose a "requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." On its face, the provision does not include direct threats to the health or safety of the disabled individual himself. Moreover, by specifying only threats to "other individuals in the workplace," the statute makes it clear that threats to other persons—including the disabled individual himself—are not included within the scope of the defense. *Expressio unius est exclusio alterius.* Finally, the obvious reading of the direct threat defense as not including threats to oneself is supported by the definitional section of Title I, which states that "[t]he term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3) (emphasis added). The fact that the statute consistently defines the direct threat defense to include only threats to others eliminates any possibility that Congress committed a drafting error when it omitted from the defense threats to the disabled individual himself. *Cf. United States Trustee v. Garvey, Schubert & Barer (In re Century Cleaning Servs., Inc.),* 195 F.3d 1053, 1057–58 (9th Cir.1999). For these reasons, we conclude that the language of the direct threat defense plainly does not include threats to the disabled individual himself.

*Id.* at 1066–67 (footnote omitted). Additionally, the *Echazabal* court explained that even the legislative history of the ADA supports the conclusion that the direct threat provision does not include threats to oneself. *Id.* at 1067. In particular, the *Echazabal* court stated the following:

The term "direct threat" is used hundreds of times throughout the ADA's legislative history—in the final confer-ence report, the various committee reports and hearings, and the floor debate. *See, e.g.,* H.R. CONF. REP. No. 101–596, at 57, 60, 77, 84 (1990), reprinted in 1990 U.S.C.C.A.N. 565, 566, 569, 586, 593. In nearly every instance in which the term appears, it is accompanied by a reference to the threat to "others" or to "other individuals in the workplace." Not once is the term accompanied by a reference to threats to the disabled person himself. In addition, both the Report of the House Judiciary in the Report of the Committee on Education and Labor explain that the direct threat provision is intended to codify the Supreme Court's holding in *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)—a case that defines "[t]he term 'direct threat' [to] mean[] a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." H.R. REP. No. 101–485, pt. 3, at 34, 45–46 (1990) (emphasis added) (*citing Arline*), reprinted in 1990 U.S.C.C.A.N. 445, 457; *see also* H.R. REP. No. 101–485, pt. 2, at 76, reprinted in 1990 U.S.C.C.A.N. 303, 359. While the House Judiciary Report notes that the ADA extends the *Arline* standard "to all individuals with disabilities, and not simply to those with contagious diseases or infections," H.R. REP. No. 101–485, pt. 3, at 45, reprinted in 1990 U.S.C.C.A.N. 445, at 468, it says nothing about extending the standard to cover a disabled person whose employment would be harmful to himself as opposed to other individuals. Finally, the following statement made by Senator Kennedy, a co-sponsor of the ADA, also strongly bolsters our reading of the statute:

The ADA provides that a valid qualification standard is that a person not pose a direct threat to the health or safety of other individuals in the workplace—that is, to other cowork-

ers or customers. . . . It is important, however, that the ADA specifically refers to health and safety threats to others. Under the ADA, employers may not deny a person an employment opportunity based on paternalistic concerns regarding the person's health. For example, an employer could not use as an excuse for not hiring a person with HIV disease the claim that the employer was simply "protecting the individual" from opportunistic diseases to which the individual might be exposed. That is a concern that should rightfully be dealt with by the individual, in consultation with his or her private physician.

136 Cong. Rec. S9684–03, at S9697 (1990). In short, the legislative history convincingly supports the unambiguous wording of the direct threat defense.

*Id.* at 1067–68 (footnote omitted).

Thus, based on this reasoning, this court concludes that the defense of direct threat to oneself is not a defense authorized by the plain language of the statute authorizing the defense of direct threat to others, 42 U.S.C. § 12113(b). However, the court finds that the direct threat to oneself is properly analyzed under the "qualification" element of Kalskett's *prima facie* ADA claim, that is, Kalskett must be able to perform the essential functions of the assembly line job at the Larson facility without a risk of injury to herself. In reaching this conclusion, the court seeks guidance from the Seventh Circuit Court of Appeals's decision in *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602–03 (7th Cir.1999). In that case, the plaintiff asserted discrimination based on perceived disability, even though "[h]e acknowledged that there was no way to do the job of cupola operator without subjecting himself to the very things his doctors recommended he stay away from." *Koshinski*, 177 F.3d at 603. In relevant part the decision continues:

Based on this evidence, the district court correctly concluded that Koshinski could not perform the essential functions of his job. *Koshinski may have shown that he wanted to return to work despite the risk of pain and harm, but that is not the test. He had to show that he was qualified to do the job. And neither he nor his doctors thought he was.*

Koshinski argues that the ADA is not a paternalistic statute designed to protect a disabled person from himself, and that an employee should not be fired or otherwise denied employment because he may become unwilling to do his job at some point in the future. In principle we do not disagree with Koshinski's argument. It would be hard to imagine, for example, that a court would sanction an employer's decision to fire a qualified employee simply because his degenerative heart disease makes a future heart attack inevitable. But here the record firmly established that Koshinski could not perform the essential functions of his job when the foundry decided to let him go.

Koshinski wanted to go back to work despite the pain and the harm he would cause himself—understandable, given that the foundry paid him twice the hourly wage he was able to earn from subsequent employers. He argues that the foundry should have allowed him to go back to work even if it meant that he would suffer considerable pain and cause his condition to worsen. That a person may cause a direct threat to himself, he argues, is of no consequence under the ADA. *Kohnke v. Delta Airlines, Inc.*, 932 F.Supp. 1110, 1111–12 (N.D.Ill. 1996), in which the district court held that the "direct threat" language in the ADA refers to direct threats to other individuals, not to the disabled person himself, supports his position. *But see* 29 C.F.R. § 1630.2(r) ("Direct Threat means a significant risk of substantial

harm to the health or safety *of the individual* or others that cannot be eliminated or reduced by reasonable accommodation.") (emphasis added). *The "direct threat" issue arises, however, only after an ADA plaintiff has made out a prima facie case, as an employer's defense to the challenged adverse employment decision. See 42 U.S.C. § 12113(b). Because Koshinski cannot show that he was entitled to protection under the ADA, we do not reach the question of whether the foundry had a valid defense for refusing to reinstate him.*

For these reasons, the judgment of the district court is affirmed.

*Id.* at 603 (emphasis added). Relying on this language, this court concludes that the direct threat to oneself is not a defense that Larson can assert here against Kalskett, however, it is part of Kalskett's burden to demonstrate whether she is qualified to perform the essential functions of the assembly-line job without risk of injury to herself. In other words, if Kalskett cannot perform the essential functions of a job without risk of injury to herself, and that risk of injury cannot be prevented by a reasonable accommodation, Kalskett cannot perform the essential functions of the job as required by the qualification element. *See Koshinski,* 177 F.3d at 602. Here, the court notes that Larson has not offered any opinion testimony from a physician that would indicate that Kalskett's continued work on the assembly line would cause undue risk to her health and safety. Rather, Larson states that after initially injuring her back on or about December 4, 1995, Kalskett suffered one re-injury after another, when attempting to return to production work in one capacity or another, and that her back condition progressively worsened. In response, Kalskett points to the testimony of her physician, Dr. Carl Lester, who testified that he believes that she was capable of performing particular functions on the assembly line after re-

viewing certain tapes of the work activities. Thus, the court concludes first that, the direct threat defense to oneself is not a defense authorized under the statute, however, in this case, the direct threat to oneself does go to Kalskett's qualification under the ADA. Here, because Kalskett has generated a genuine issue of material fact that she could perform the essential functions of the assembly line job without injury to herself, and with reasonable accommodation, the court concludes that Larson is not entitled to judgment as a matter of law on this basis. *See* FED. R. CIV. P. 56(c) (summary judgment may only be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

## C. *Kalskett's State Law Claim*

■ Having addressed Kalskett's federal disability discrimination claim under the ADA, the court turns its attention to Kalskett's disability discrimination claim under Iowa law. Iowa Code § 216.6 makes it an unfair or discriminatory employment practice to "discharge" or "otherwise discriminate" against any employee "because of" a disability "unless based upon the nature of the occupation." Iowa Code § 216.6; *Sierra v. Employment Appeal Bd.,* 508 N.W.2d 719, 722 (Iowa 1993). Iowa courts look to the ADA, its regulatory interpretations, and its case law in construing a disability claim under the Iowa Civil Rights Act (ICRA). *See Fuller v. Iowa Dept. of Human Servs.,* 576 N.W.2d 324, 329 (Iowa 1998). The foregoing analysis under the ADA, therefore, applies with equal force to Kalskett's ICRA claim. Consequently, because the court finds that Kalskett has generated a genuine issue of material fact as to whether she was "qualified" for the assembly line position with reasonable accommodation only, the court denies Larson's Motion for Summary Judgment on Kalskett's claim of disability

discrimination with respect to this position under Iowa Code Chapter 216.

### III. CONCLUSION

The court concludes that Larson is entitled to summary judgment based on Kalskett's claims that she was discriminated against because Larson did not accommodate her disability when it refused to reassign her to the following positions: team leader of Line 3, crew leader of any of the lines Larson added in late 1998 through 1999, trainer, assistant to trainer, and the inventory control position. This is so, because Kalskett has failed to generate a genuine issue of material fact that any of these positions were vacant or would become vacant within a reasonable amount of time under the ADA. However, the court concludes that Kalskett has generated a genuine issue of material fact that she is qualified to perform the essential functions of the assembly line job with reasonable accommodation. Therefore, Larson's Motion for Summary Judgment is **granted in part, and denied in part.**

**IT IS SO ORDERED.**