Douglas **MILLAGE**, Plaintiff,

v.

**CITY OF SIOUX CITY**, Defendant.

No. C02–4009–MWB.

United States District Court,
N.D. Iowa,
Western Division.

April 25, 2003.

---

James L. Abshier, City Atty., Connie E. Anstey, Assist. City Atty., City Attorney's Office, Sioux City, IA, for defendant.

Dennis M. McElwain, Smith & McElwain, Sioux city, IA, for plaintiff.

## MEMORANDUM OPINION AND OR-DER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 978
   A.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 978
   B.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 979

II.  LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 981
   A.  Standards For Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 981
   B.  Timeliness Of The Administrative Charge . . . . . . . . . . . . . . . . . . . . . . . . . 982
      1.  Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982
      2.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 983
         a.  Limitations period for administrative charge . . . . . . . . . . . . . . . 984
         b.  Is there a "deferral-state agency"? . . . . . . . . . . . . . . . . . . . . . . . . 984
         c.  Was the charge "initially filed" with the deferral-state
            agency? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 984
   C.  Disability Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986
      1.  Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986
      2.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988
         a.  The "disability" at issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988
         b.  "Qualified to perform the essential functions of the position" . . . . 989
            i.   Blanket exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 990
            ii.  Individualized assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 992
            iii. Inconsistent representations of disability . . . . . . . . . . . . . . . . . 994

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 995

## I. INTRODUCTION

### A. Procedural Background

In this lawsuit, filed February 15, 2002, plaintiff Douglas Millage alleges that his former employer, the City of Sioux City, Iowa, violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, when the City placed him on a leave of absence from his job as a bus driver on or about August 21, 2000, because he is an insulin-dependent diabetic. In Count I of his Complaint, Millage asserts a "perceived disability" discrimination claim, and in Count II, he asserts a "record of disability" discrimination claim. He prays for reinstatement, back pay, compensatory damages, attorney fees and costs, and such other relief as the court deems proper.

The City filed its Answer on March 19, 2002, denying Millage's claims, and also asserting various affirmative defenses. More specifically, the City alleges as affirmative defenses that Millage's Complaint fails to state a claim upon which relief can be granted; that Millage's administrative charge was untimely, thus barring his claims in this lawsuit; that Millage is not disabled or is not a qualified person with a disability within the meaning of the ADA; that Millage failed to meet the minimum qualifications for continued employment as

a motor coach operator; that Millage posed a direct threat to the health and safety of others owing to his inability to meet the physical qualifications set forth in the Federal Motor Carrier Safety Standards; that Millage is not a qualified individual with a disability as a matter of law, because he has applied for and received long-term disability benefits conditioned on his total disability from performing any job; that Millage never sought reasonable accommodation from the City and rejected the City's offer regarding preference; and that the accommodation Millage now requests would improperly require the City to disregard job qualifications, which require motor coach operators to have a valid commercial driver's license (CDL) and to meet the physical qualifications set forth in the Federal Motor Carrier Safety Regulations.

By order dated July 23, 2002, this court set this matter for jury trial on June 16, 2003. Thereafter, this case proceeded without other incident requiring mention here until March 10, 2003, when the City filed the motion for summary judgment presently before the court. Millage resisted the motion for summary judgment on March 28, 2003, asserting that genuine issues of material fact preclude summary judgment, and the City filed a reply on April 4, 2003. Neither party requested oral arguments on the motion for summary judgment in the manner set forth in N.D. IA. L.R. 56.1(f), and the court has concluded that no oral arguments are necessary. Therefore, the motion for summary judgment is now fully submitted.

### B. Factual Background

Whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues of material fact for trial. *See, e.g., Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996). Nevertheless, the court will not attempt here a comprehensive review of the undisputed and disputed facts in the record. Rather, the court will present here only sufficient factual background to put in context the parties' arguments for and against summary judgment on Millage's claims. More attention will be given to specific factual disputes, where necessary, in the court's legal analysis.[1]

The parties agree that Millage was employed as a Motor Coach Operator, *i.e.,* a bus driver, for the City from August 19, 1984, until his termination effective March 15, 2002. Millage has offered evidence that, of the approximately twenty-one city bus routes, the City of Sioux City has three bus routes that require the driver to

---

1. Not all of the facts stated here, either as undisputed or disputed, appear in the parties' respective statements of facts. Rather, some have been gleaned from the parties' factual assertions in their briefs, where the parties apparently recognized that a larger universe of facts was pertinent to the disposition of the motion for summary judgment. Where there appears to be no dispute about pertinent facts from "outside" of the parties' statements of facts, specific factual assertions are supported by adequate citations to the record in the parties' briefs, or the court has found in the parties' appendices support for specific facts that the court considered pertinent to the parties' contentions, the court has included those facts—and factual disputes—in its state-

ment of the "factual background." Of course, the court does not make "findings of fact" in its disposition of a motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (in reviewing the record on a motion for summary judgment, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick,* 90 F.3d at 1377 (same). Therefore, if this matter proceeds to trial, any and all facts must be proved by the greater weight of the evidence, at least in the absence of a stipulation, by the party relying on those facts to prove a claim or affirmative defense.

take the bus out of the city limits, and two of those bus routes require the driver to cross state lines into North Sioux City, South Dakota, and South Sioux City, Nebraska, respectively. The City contends that all bus drivers must be able to drive all routes, but Millage contends that he has sufficient seniority to be assigned only to intra-city routes and to refuse even "emergency" assignment to an interstate route. This dispute apparently goes to whether or not the Federal Motor Carrier Safety Standards for interstate drivers, upon which the City relies, are applicable to Millage's bus driver position.

The parties do not dispute that, throughout his employment, Millage had a satisfactory safety record. Although Millage suffered a diabetic reaction on June 20, 2000, which involved his feeling "clammy, sweaty, and having the shakes," and had to be removed from his bus, it does not appear that even this incident involved any danger to passengers. Millage was off work for either one week or two immediately thereafter—the parties disagree about which—apparently on doctor's orders, so that he could attempt to get his diabetes under control.

Millage avers that he was diagnosed with diabetes in 1988, but that he was able to treat the condition with oral medications for several years thereafter. However, he admits that, at some time before the summer of 2000, his diabetes began to require treatment with injected insulin. He apparently did not inform the City of the change in his diabetes treatment regimen. Instead, during a routine bi-annual physical examination in August of 2000, which was required for all bus drivers, the City learned that Millage's diabetes required insulin treatment.

As a result of the City's discovery that Millage suffered from insulin-dependent diabetes, the City determined that Millage no longer met the minimum physical requirements of the Federal Bureau of Motor Carrier Safety for interstate drivers, set forth at 49 C.F.R. § 391.41, which, along with possession of a valid CDL, were requirements for a position as a Motor Coach Operator for the City of Sioux City under an agreement with the local transit workers' union. Consequently, the City placed Millage on a paid leave of absence on the ground that he did not meet the requirements for his position as a bus driver.

The City contends that Millage has been unable to control his diabetes and that he has neither a valid CDL nor the necessary medical certification to work as a City bus driver. The City contends that it held a disciplinary hearing on August 17, 2000, at which it gave Millage from August 17, 2000, through August 25, 2000, to produce a valid CDL and medical certification, but that he was unable to do so. The City asserts that it then gave Millage until March 2002 to produce such a medical certification, but he was still unable to do so. Therefore, the City states that it terminated Millage's employment on March 15, 2002. Millage, however, disputes whether his diabetes is under adequate control. He also disputes whether he is required to pass the minimum physical requirements of the Federal Bureau of Motor Carrier Safety to retain his job as a bus driver with the City, because he contends that a waiver of those requirements for interstate drivers is available under state law, where, for example, he could be assigned to drive strictly intra-city and intra-state bus routes. Finally, he disputes whether he has a valid medical certificate, because he has submitted what he asserts is a medical examiner's certificate dated August 24, 2002. *See* Plaintiff's Appendix at 5. However, the City argues that the certificate is incomplete, because it is not signed by the *doctor who purportedly* conducted the examination.

Although Millage does not contend that he is actually disabled within the meaning of the ADA, he applied for both long-term disability benefits under a benefits plan with the City and for disability benefits under the Social Security Act. He received the former benefits, but was denied the latter. The City contends that Millage's application for long-term disability benefits is inconsistent with his present assertion that he is qualified to work as a bus driver, because qualification for long-term disability benefits required him to aver that he is totally disabled from his bus driver job. Millage contends that his purportedly inconsistent positions with regard to whether or not he is able to work as a bus driver can be explained by his economic necessity when his sick leave and vacation benefits ran out and he was unable to find other employment. He also contends that, if the City is right about his inability to perform his job as a bus driver, he certainly is "disabled" within the meaning of the long-term disability benefits plan.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedure providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986); *Quick*, 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct.

2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994). The court will apply these standards to the City's motion for summary judgment on Millage's disability discrimination claims.

### B. Timeliness Of The Administrative Charge

The City first seeks summary judgment on the ground that Millage's administrative charge asserting his disability discrimination claims was untimely, so that he cannot now assert his claims in this action. Therefore, before considering whether or not there are genuine issues of material fact on the elements of Millage's disability discrimination claims, the court must determine whether the claims are barred by untimely filing of Millage's administrative charge.

#### 1. Arguments of the parties

Although the City asserted that Millage's "Complaint" was not timely in its summary judgment motion, *see* Defendant's Motion For Summary Judgment, ¶ 5, in its Answer, the City asserted that "Plaintiff's Complaint contains allegations that occurred more than 180 days prior to the filing of his original complaint with the Iowa Civil Rights Commission, and this Court, therefore, has no jurisdiction to hear such matters." *See* Answer, Affirmative Defenses, ¶ 14. Thus, it is not altogether clear from these filings what the "untimeliness" issue raised in the City's motion for summary judgment might be: untimeliness of the complaint in this court, or untimeliness of the administrative charge. The City's argument in its opening brief in support of its motion for summary judgment, however, clarifies matters somewhat, because it is consistent with the "untimeliness" allegation in its affirmative defense: The City argues in its opening brief that Millage's complaint with the Iowa Civil Rights Commission (ICRC) was not filed until June 28, 2001, more than 180 days following his removal from duty for failure to meet the physical and licensing requirements for his job as a bus driver, which the City contends occurred on August 14, 2000. The City acknowledges, however, that Millage filed a complaint with the Equal Employment Opportunity Commission (EEOC) on June 8, 2001, but apparently also considers this filing to be untimely or irrelevant, because it was also well outside the 180–day limitations period upon which the City relies, and was not with the ICRC. *Id.* The City cites no authority for the applicable deadline for the filing of Millage's administrative charge or its disregard of the first-filed EEOC administrative charge.

Perhaps not surprisingly, given the short shrift that the issue of the purported untimeliness of his administrative charge received in the City's opening brief, Millage's resistance to summary judgment on this ground is equally brief, and indeed, is relegated to a footnote. *See* Plaintiff's Brief In Support Of His Resistance To Motion For Summary Judgment, 7 n. 2. Millage argues that his charge was filed with the EEOC within 300 days of the

discriminatory event, and then cross-filed with the ICRC. He argues, further, that the extended 300–day period for filing applies in "deferral states," presumably arguing that Iowa is such a state, even though the charge would be untimely under state law. In support of this contention, Millage cites *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988). Thus, Millage's argument for the timeliness of his administrative charge is nearly as opaque, on its face, as the City's argument for the untimeliness of the charge.

In its reply brief, the City makes a much more complete exposition of its contentions regarding the purported untimeliness of Millage's administrative charge.[2] The City argues that Millage was placed on leave with pay on August 14, 2000, because of his inability to provide a valid medical certificate, but his charge of discrimination was not filed with the ICRC until June 18, 2001, and the ICRC did not issue a "deferral letter" until June 28, 2000. Relying on the language regarding the time for filing an administrative charge under the ADA, 42 U.S.C. § 2000e–5(e)(1), the City argues that Millage cannot take advantage of the 300–day limitations period, because his administrative charge was not "initially filed" with the ICRC, but was instead "initially filed" with the EEOC. As a consequence, the City contends that Millage missed the applicable 180–day filing period for his ad-

ministrative charge, because his charge was not filed with the ICRC until 308 days after he was placed on paid leave, and the letter from the ICRC notifying him of "deferral" to the EEOC was not written until 318 days after the allegedly discriminatory event. The City attempts to distinguish *Commercial Office Products* on the basis that, in that case, both the EEOC and state administrative charges were filed within the 300–day limitations period, but in this case, by the City's calculation, the charge with the EEOC was filed on day 298, but the charge with the ICRC was not filed until day 308. Thus, the City contends that Millage's failure to meet the time limits set forth in 42 U.S.C. § 2000e–5(e) not only prohibits state administrative action on his claims, but also renders the charge with the EEOC untimely.

### 2. Analysis

#### a. Limitations period for administrative charge

■ Pursuant to 42 U.S.C. § 12117(a), an administrative charge of disability discrimination in violation of the ADA is subject to the time limitations set forth in § 706(e)(1) of Title VII, that is, 42 U.S.C. § 2000e–5(e)(1). *See* 42 U.S.C. § 12117(a) (providing that the procedures set forth in § 706 apply to claims arising under the ADA); *Tewksbury v. Ottaway Newspa-*

---

**2.** The court does not approve of "hiding the ball" on any issue until after the non-moving party has responded. Such a ploy effectively deprives the non-moving party of a full and fair opportunity to address pertinent arguments. Moreover, the purpose of a reply is not to assert arguments that could and should have been asserted in support of the original motion, but to address "newly-decided authority or to respond to new and unanticipated arguments made in the resistance." *See* N.D. IA. L.R. 7.1(g) (authorizing reply briefs); *see also* N.D. IA. L.R. 56.1(d) (authorizing reply briefs in support of a motion for

summary judgment "in conformity with LR 7.1(g)"). The court will assume, without deciding, that the City has not acted in bad faith by raising the issue of the purported untimeliness of Millage's administrative charge in only skeletal form in its initial brief, then fleshing out the argument in its reply. Also, in light of governing law, the court finds that Millage was not prejudiced by the City's timing of its various arguments. Therefore, the court will consider what otherwise might be "untimely" arguments in the City's reply brief concerning "untimeliness" of the administrative charge.

*pers,* 192 F.3d 322, 325 (2d Cir.1999). Section 706(e)(1), in turn, states the following:

(1) A charge under this section shall be filed within *one hundred and eighty days after the alleged unlawful employment practice occurred* and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, *except* that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved *within three hundred days after the alleged unlawful employment practice occurred,* or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e–5(e)(1) (emphasis added). Thus, whether or not the limitation period for filing an administrative charge is 180 days or 300 days depends upon whether or not "the person aggrieved has *initially instituted* proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof." *Id.* (emphasis added). This statutory provision thus begs two questions regarding the timeliness of Millage's administrative charge in this case: (1) Does Iowa have "a State or local agency with authority to grant or seek relief from" disability discrimination claims? and (2) Was Millage's administrative charge "initially filed" with that state or local agency?

### b. Is there a "deferral-state agency"?

The first question can be answered quite briefly. Iowa does, indeed, have a State agency with authority to grant relief from disability discrimination. The Iowa Civil Rights Act, Iowa Code Chapter 216, not only prohibits discrimination on the basis of disability, *see* Iowa Code § 216.6(1)(a), but also created the Iowa Civil Rights Commission (ICRC) to grant relief from such discrimination. *See* Iowa Code §§ 215.3 (creation) & 216.5 (duties). Because it meets these requirements, the ICRC is called a "deferral-state agency." *See Tewksbury,* 192 F.3d at 325 ("The [state agency] has authority to remedy employment discrimination, rendering [the state] a so-called deferral state under Section 706(e)(1)," and therefore describing the state agency responsible for enforcement of the state employment discrimination laws as "a deferral-state agency"). Thus, the first requirement for application of a 300–day limitations period has been met in this case.

### c. Was the charge "initially filed" with the deferral-state agency?

The more complicated question is whether Millage's administrative charge was "initially filed" with the ICRC, when it was actually first filed with the EEOC. The answer to this question might require a lengthy dissertation on the import of § 706(e)(1), federal regulations, including 29 C.F.R. §§ 1601.13 and 1626.10, and federal court decisions, were it not for the fact that the Second Circuit Court of Appeals has already written such a dissertation in *Tewksbury v. Ottaway Newspapers,* 192 F.3d 322, 325–28 (2d Cir.1999).

In *Tewksbury,* the Second Circuit Court of Appeals was presented with facts similar in all pertinent respects to those pre-

sented here: The parties agreed that the plaintiff filed his administrative charges with the EEOC more than 180 days and less than 300 days after he was allegedly discriminated against, but he did not file any charges directly with the deferral-state agency, the New York State Division of Human Rights (N.Y.SDHR). *Tewksbury,* 192 F.3d at 325. Here, the City concedes that Millage filed his administrative charge *with the EEOC* 298 days after the alleged discrimination by the City—that is, he filed his administrative charge with the EEOC on June 8, 2001, 298 days after he was put on paid leave by the City on August 14, 2000—but did not file any charge directly with the ICRC. As in *Tewksbury,* the EEOC also transmitted the administrative charge to the appropriate "deferral-state agency," *i.e.,* one satisfying the first question addressed above. *See id.* In *Tewksbury,* as here, the plaintiff argued that his ADA charge should be deemed to have been "initially filed" with the state agency, and consequently to be timely, when he filed it with the EEOC. *Id.* The court in *Tewksbury* held that an administrative charge is subject to a 300–day limitations period, is timely filed, and is "initially filed" with the deferral-state agency, even though it was actually filed first with the EEOC, where the EEOC and the deferral-state agency agree to act as agents for each other in the filing of charges of discrimination pursuant to a Work–Sharing Agreement. *Tewksbury,* 192 F.3d at 326–28. Therefore, the claimant's administrative charge was timely filed. *Id.* at 328.

This court reaches the same conclusion in this case. In this case, the ICRC waived its right to exclusive jurisdiction when it notified Millage that "[t]he initial processing of this complaint will be conducted by the Equal Employment Opportunity Commission." *See* Plaintiff's Appendix at 24 (June 28, 2001, "deferral" letter from the ICRC). Moreover, the EEOC and the ICRC routinely "cross-file" administrative charges, each acting as the agent of the other, pursuant to a "Work–Sharing" agreement between the two agencies authorized by 29 C.F.R. § 1626.10 and Iowa Administrative Code § 161—1.6(216) ("Referral and deferral agencies"). *See Tewksbury,* 192 F.3d at 327; *see also www.state.ia.us/government/crc* (website of the Iowa Civil Rights Commission).[3] Such a "Work–Sharing" agreement between the ICRC and the EEOC was in place in 2001, at the time that Millage filed his administrative charge with the EEOC, and that agreement is a matter of public record. *See* Worksharing Agreement Between Iowa Civil Rights Commission and Equal Employment Opportunity Commission For Fiscal Year 2001 (2001 Work–Sharing Agreement). Section II, ¶ A of that agreement provides,

> In order to facilitate the assertion of employment rights, the EEOC and the [ICRC] each designate the other as its agent for the purpose of receiving and drafting charges. EEOC's receipt of charges on the [ICRC's] behalf will automatically initiate the proceedings of both EEOC and the [ICRC] for the

---

**3.** The website of the Iowa Civil Rights Commission addresses the following "Frequently Asked Question" (FAQ):

> Q: Is there any time limit to file a complaint?
>
> A: Yes. You have 180 days from the date that you first found out about the discriminatory incident to file with the Iowa Civil Rights Commission. Your case will also be

filed with EEOC or HUD, if these federal laws apply to your case. EEOC has a time limit of 300 days from the date of the discriminatory incident[.]

This FAQ reflects the "Work–Sharing" agreement between the ICRC and the EEOC, at least to the extent that it shows that the ICRC will "defer" an administrative charge to the EEOC.

purposes of Section 706(c) and (e)(1) of Title VII. This delegation of authority to receive charges does not include the right of one Agency to determine the jurisdiction of the other Agency over a charge. Charges can be transferred from one agency to another in accordance with the terms of this agreement or by other mutual agreement.

2001 Work–Sharing Agreement, § II, ¶ A. Another provision of the 2001 Work–Sharing Agreement also provides that the ICRC waives its right to exclusive jurisdiction to initially process charges under certain federal laws, including the ADA. *See id.* at § III, ¶ A. Thus, all the requirements for a timely filing with the EEOC within 300 days, as explained in *Tewksbury,* are met in this case. *See Tewksbury,* 192 F.3d at 325–28.

Therefore, Millage's administrative charge was "initially filed" with the ICRC within the 300–day limitations period, and was timely, even though his charge was actually filed first with the EEOC. The City is not entitled to summary judgment on the ground that Millage's administrative charge was untimely.

### C.  Disability Discrimination

Because the court concludes that Millage's administrative charge was timely filed, the court turns next to the question of whether or not the City is entitled to summary judgment on Millage's disability discrimination claims based on the record evidence concerning the elements of those claims. The court begins with the arguments of the parties on these issues.

### 1.  Arguments of the parties

In its opening brief, the City argues that it is entitled to summary judgment on Millage's disability discrimination claims, because Millage is unable to perform the essential functions of his position as a bus driver. More specifically, the City argues that "driving" is an essential function of Millage's former position as a bus driver, and that the job requirements for that position included the ability to meet the safety standards adopted by the City. However, the City argues that it is undisputed that Millage did not, and cannot now, meet the requirements of the Federal Motor Carrier Safety Standards, because he is an insulin-dependent diabetic with poor control over his condition. The City acknowledges that it was not *required* to follow the federal safety standards in question, but argues that it adopted these standards and the local transit union accepted them as part of the contract for the position. Moreover, the City contends that Millage constitutes a "direct threat" to the safety of himself and others if he is behind the wheel of a bus, because of his poor control of his diabetes. The City also argues that Millage has failed to explain the inconsistency between his contention in this case that he is able to perform his job as a bus driver and his application for long-term disability benefits, which was dependent upon his complete disability from his job as a bus driver.

As the second principal ground for its motion, the City argues that Millage's proposed accommodation, that the City ignore the requirements of the federal safety standards, is not reasonable. This is so, the City argues, because there is no accommodation that would guarantee that Millage would not suffer a diabetic reaction while operating a city bus. Moreover, the City argues that Millage cannot be guaranteed only intra-city routes, which might qualify him for a waiver under state law of the federal safety standards for interstate drivers, because any restrictions placed on the ability of a particular driver to drive interstate routes poses an undue hardship to the City's operation of the transit system and to the public, which relies on that transit system.

Millage disputes these contentions. First, he argues that he is capable of safely performing the essential functions of a Motor Coach Operator. He points out that the City has voluntarily imposed a "blanket exclusion" on drivers with insulin-dependent diabetes, contrary to the requirements of *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), which requires an "individualized assessment" of his impairment under the ADA. He also cites *Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir.2002), as rejecting a blanket exclusion for a police officer position, based on insulin-dependent diabetes, even though "driving" was an essential function of the job in question. Millage also disputes the City's "direct threat" defense, on the ground that he was not having significant problems with his diabetes at the time he was placed on paid leave, and that there is no evidence of "palpable problems" with his driving a City bus. He also argues that subsequent medical reports demonstrate that his diabetes is under adequate control. Finally, he argues that, under the requisite individualized assessment, his safety record generates genuine issues of material fact on the issue of whether or not he could perform his job safely.

Turning to the City's reasonable accommodation arguments, Millage acknowledges that there is no requirement for "reasonable accommodation" of a perceived disability. However, he argues that the purported "essential" job requirement of compliance with federal safety standards can be "accommodated," because there is a relatively easy process to obtain a waiver of those requirements pursuant to state law. He also argues that he has sufficient seniority to avoid being assigned to an interstate route, either regularly or on an "emergency" basis, so that compliance with the waiver requirements also does not require unreasonable accommodation.

As to the purported inconsistency between his claims in this case that he can perform the essential functions of his job and his application for long-term disability benefits on the basis of averments of complete disability, Millage argues that he has made a sufficient explanation. Specifically, he contends that economic necessity drove him to apply for long-term disability benefits after he had exhausted his paid leave, sick leave, and vacation pay, but could not find another job. Moreover, he argues that if he could not, in fact, comply with the federal safety requirements, because he was an insulin-dependent diabetic, and those requirements were properly imposed for a bus driver position with the City, he most certainly was "disabled" within the meaning of the long-term disability plan.

In reply, the City reiterates its contentions that Millage is not a qualified person with a disability within the meaning of the ADA, because, as an insulin-dependent diabetic with poor control of his condition, he cannot meet the requirements for the position of a bus driver with the City. The City argues that it gave Millage an extended period of time to produce the required medical certificate, as well as his CDL, but that he has not been able to do so. The City contends that the purported medical certificate that Millage submits in his appendix is not valid, because it is not signed by the examining doctor. As to Millage's contention that the City could easily obtain a waiver of the requirements of the federal safety standards for interstate drivers pursuant to state law, the City contends that it is undisputed that Millage would not qualify for such a waiver, because he did not suffer from insulin-dependent diabetes prior to July 29, 1996, and because he would be required to drive interstate routes as well as intra-state routes. The City contends that it cannot be a reasonable accommodation to require the City

representative who must apply to the state for the waiver to make false statements under oath on the application.

### 2. Analysis

In *Barnes v. Northwest Iowa Health Center,* 238 F.Supp.2d 1053 (N.D.Iowa 2002), this court outlined the analytical framework for a disability discrimination claim, as follows:

> The ADA affords protection from discrimination to any "qualified individual with a disability." 42 U.S.C. § 12112(a). "A plaintiff who raises a claim of disability discrimination bears the initial burden of establishing a prima facie case." *Lajeunesse v. Great Atlantic & Pac. Tea Co.,* 160 F.Supp.2d 324, 330 (D.Conn. 2001) (citing *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998); *Wernick v. Federal Reserve Bank,* 91 F.3d 379, 383 (2d Cir.1996)). If the plaintiff fails to establish any element of her *prima facie* case, then summary judgment may be appropriate. *Kellogg v. Union Pac. RR. Co.,* 233 F.3d 1083, 1086 (8th Cir.2000). However, if the plaintiff proves her *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant successfully does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered legitimate reason is merely a pretext for unlawful discrimination. *Id.* Thus, in order for [the plaintiff] to recover on her ADA claim, she must establish that, at the time she alleges she was discriminated against: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the position; and (3) she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination based on disability. *E.g., Dropinski v. Douglas County, Neb.,* 298 F.3d 704, 706 (8th Cir.2002) (outlining

*prima facie* case of disability discrimination) (citing *Greer v. Emerson Elec. Co.,* 185 F.3d 917, 921 (8th Cir.1999); *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1087 (8th Cir.2001)) (same) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135 (8th Cir.1999) (*en banc*)); *Heaser v. Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001) (same); *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 678 (8th Cir.2001) (same); *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 959–60 (8th Cir.2000) (same); *Treanor v. MCI Telecomm. Corp.,* 200 F.3d 570, 574 (8th Cir.2000) (same); *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1016 (8th Cir.2000) (same); *Browning v. Liberty Mut. Ins. Co.,* 178 F.3d 1043, 1047 (8th Cir.1999) (same).

*Barnes,* 238 F.Supp.2d at 1066–67.

#### a. The "disability" at issue

■ The first element of a *prima facie* case of disability discrimination requires proof that the plaintiff was "disabled" within the meaning of the ADA. *See id.* "Disability" within the meaning of the ADA is defined in § 12102(2) in three discrete ways as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Millage has expressly alleged only "perceived disability" and "record of disability" claims, based on his diabetes, that is, "disability" within the meaning of § 12102(2)(B) and (C), not a claim that he was discriminated against on the basis of an "actual disability" within the meaning of § 12102(2)(A). *See* Complaint, Counts I ("perceived disability" discrimination) & II ("record of disability" discrimination). However, the City has not moved for summary judgment on the ground that Millage is not "disabled" within the meaning of the

ADA, but on the ground that he cannot meet the second element of his *prima facie* case, which requires proof that Millage "was qualified to perform the essential functions of the position." *Barnes,* 238 F.Supp.2d at 1067. The court, therefore, turns to that element of Millage's *prima facie* case.

### b. *"Qualified to perform the essential functions of the position"*

■ As to the "qualification" element of a *prima facie* case of disability discrimination, this court explained in *Barnes* that, "[t]o be a qualified individual within the meaning of the ADA, [the plaintiff] must (1) possess the requisite skill, education, experience, and training for h[is] position; and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Barnes,* 238 F.Supp.2d at 1080 (citing 42 U.S.C. § 12111(8), *Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 786–87 (8th Cir.1998), and 29 C.F.R. § 1630.2(m)). As in *Barnes,* it appears that only the second prong of this element is at issue here, because the City does not dispute that Millage had the skill, education, experience, or training for his position as a bus driver with the City, presumably because he had been performing that job with the City since 1984. *Id.*

As to the "essential functions" prong, this court explained in *Barnes,*

"An essential function 'means the fundamental job duties of the employment position the individual with a disability holds or desires'. The term 'essential functions' does not include the marginal functions of the position.'" *Moritz,* 147 F.3d at 787 (quoting 29 C.F.R. § 1630.2(n)(1)). "Although an ADA plaintiff retains the ultimate burden of proving that [s]he is a qualified individual, an employer who disputes the plaintiff's claim [s]he can perform the essential functions must put forth evidence establishing those functions." *Maziarka*

*v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 680 (8th Cir.2001) (citing *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1113 (8th Cir.1995)). In *Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784 (8th Cir.1998), the Eighth Circuit Court of Appeals stated that an essential function may be established by evidence of the following:

(1) "[t]he employer's judgment as to which functions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs."

*Id.* at 787 (quoting 29 C.F.R. § 1630.2(n)(3)). Moreover, the regulations provide

A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

\*    \*    \*    \*    \*    \*

A determination of what functions are essential is fact-specific, and "[t]he inquiry into whether a particular function

is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." *Id.* at app. § 1630.2(n)....

*Barnes,* 238 F.Supp.2d at 1081–82.

*i. Blanket exclusion.* It is true that, prior to the Supreme Court's decision in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), courts had upheld "blanket" exclusions of persons with certain conditions— such as insulin-dependent diabetes—from employment requiring certain functions, such as "driving," either on the ground that those persons could not perform the essential functions of their positions, or on the ground that allowing them to do so would pose a "direct threat" to themselves or others. For example, the Fifth Circuit Court of Appeals briefly discussed, and upheld, a "blanket exclusion" for diabetic police officers in *Gonzales v. City of New Braunfels, Tex.,* 176 F.3d 834 (5th Cir. 1999), as follows:

> [W]e observe that, under the current law in this circuit, a driver with insulin-dependent diabetes poses a direct threat to the health and safety of others as a matter of law. [*See Chandler v. City of Dallas,* 2 F.3d 1385, 1395 (5th Cir.1993); *Daugherty v. City of El Paso,* 56 F.3d 695, 698 (5th Cir.1995).] As it is undisputed that driving is an essential function of every NBPD police officer, Gonzales is not qualified for the position in the absence of an accommodation that will eliminate the inherent safety risk that his driving poses. And, as Gonzales cannot show that retesting would make him a safer driver, given his neuropathy, such an accommodation, *i.e.,* retesting, cannot be considered reasonable under the Act.

> We recognize that, in light of changes to the federal regulations on which our *per se* rule was based, as well as possible

advancements in medical technology, the blanket exclusion of insulin-dependent diabetics from positions that require driving may no longer be viable. [*See Kapche v. City of San Antonio,* 176 F.3d 840 (5th Cir.1999) (on remand for consideration of this issue).]

*Gonzales,* 176 F.3d at 838 (footnotes omitted and citations therein inserted in the text).

However, the Supreme Court's decision in *Sutton* suggested the inapplicability of "blanket exclusions." Although in *Sutton* the Supreme Court was considering what constitutes a "perceived disability," not what constitutes an "essential function" of a particular position, the Court observed that "whether a person has a disability under the ADA is an individualized inquiry." *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 (citing *Bragdon v. Abbott,* 524 U.S. 624, 641–642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), as "declining to consider whether HIV infection is a *per se* disability under the ADA," and 29 CFR pt. 1630, App. § 1630.2(j), which states that "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"). The Court went further:

> The agency guidelines' directive that persons be judged in their uncorrected or unmitigated state runs directly counter to the individualized inquiry mandated by the ADA. The agency approach would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition. For instance, under this view, courts would almost

certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. *A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus, the guidelines approach would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals. This is contrary to both the letter and the spirit of the ADA.*

*Sutton,* 527 U.S. at 483–84, 119 S.Ct. 2139 (emphasis added). Similarly, in a recent case involving a diabetic pharmacist, the Eighth Circuit Court of Appeals made the following observation:

> The Supreme Court in *Sutton* expressly ruled that "[a] 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it *'might,' 'could,'* or *'would'* be substantially limiting if mitigating measures were not taken." *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139 (emphasis added). Therefore, neither the district court nor we can consider what would or could occur if Orr failed to treat his diabetes or how his diabetes might develop in the future. Rather, *Sutton* requires that we examine Orr's present condition with reference to the mitigating measures taken, *i.e.,* insulin injections and diet, and the actual consequences which followed. *See id.*

*Orr v. Wal–Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir.2002) (emphasis in the original).

Taking up this theme of "individual assessment," in the context of ability to perform the essential functions of a particular position, the Fifth Circuit Court of Appeals in *Gonzales* considered the following, in the alternative to its adherence to a "blanket exclusion" on diabetic drivers:

> [I]t is undisputed that, in the instant case, Dr. Davis performed an individualized assessment of Gonzales's medical condition and, based on that assessment, concluded that his diabetic neuropathy prevents Gonzales from being able to handle a firearm safely or to drive a vehicle to police specifications. Hence, we conclude that, even in the absence of the *per se* rule, there is no genuine issue of material fact as to whether Gonzales is qualified for the job of police officer, with or without the retesting accommodation.

*Gonzales,* 176 F.3d at 838.

Subsequently, as Millage argues, a panel of the Fifth Circuit Court of Appeals went still further. In *Kapche v. City of San Antonio,* 304 F.3d 493 (5th Cir.2002), the court explained that its prior conclusions that, as a matter of law, a person with insulin-treated diabetes mellitus (ITDM) cannot perform the essential functions of driving were a "divergence" from the rule of "individualized assessment." *Kapche,* 304 F.3d at 494. Upon appeal of the remand of the case to consider whether such a "blanket exclusion" should stand, the court turned to the *Sutton* decision and other "intervening Supreme Court cases" for guidance. *See id.* at 497–99, 119 S.Ct. 2139. The court concluded that "[t]hese intervening Supreme Court cases consistently point to an individualized assessment mandated by the ADA under various sections of the Act," which the court determined was applicable to determination of a claimant's ability to perform the essential functions of a job. *Id.* at 499, 119 S.Ct. 2139. The court added, "We further note that we are unaware of any decision from our sister Circuits abrogating the requirement of an individualized assessment in favor of a *per se* exclusion under the

ADA." *Id.* For these reasons, the court held "that an individualized assessment of [the claimant's] present ability to safely perform the essential functions of [a job] is required." *Id.* at 500, 119 S.Ct. 2139.

■ This court agrees with the reasoning in *Kapche* to hold that determination of whether or not a claimant under the ADA can perform the essential functions of a particular job must be based upon an "individualized assessment" of his or her ability to perform the job safely, and cannot be based simply on a blanket exclusion. This court adds as an additional rationale for this conclusion consideration of the factors applicable to determination of what constitutes the "essential functions" of a job. *See, e.g., Barnes,* 238 F.Supp.2d at 1081–82. As quoted above from *Barnes,* each of those factors considers, at an individual, fact-based level, what is actually required to do the job in question, not merely "blanket requirements" that have not been shown to have a relationship to the specific job in question. This is so, for example, because " '[t]he inquiry into whether a particular function is essential initially focuses on whether the employer *actually requires* employees in the position to perform the functions that the employer asserts are essential.' " *Id.* at 1082 (quoting 29 C.F.R. app. § 1630.2(n)) (emphasis added). To the extent that the City relies on a "blanket exclusion" of a person with insulin-dependent diabetes from being a bus driver, standing alone, the City is not entitled to summary judgment.

■ *ii. Individualized assessment.* In this case, the proper assessment of whether Millage is "qualified" to perform the job of bus driver must be made in terms of an individualized assessment of whether or not he can perform the essential functions of the job, in light of the factors cited in *Barnes,* 238 F.Supp.2d at 1082. For example, those factors would allow consideration of the fact that it is the City's judgment that compliance with requirements of the Federal Bureau of Motor Carrier Safety, as set forth at 49 C.F.R. § 391.41, is "essential" to safe performance of the job of City bus driver, and that meeting those physical or medical requirements is part of the "written job description" prepared for the job of City bus driver. *See id.* However, to the extent that the City has justified these requirements on the ground that some of its bus routes are actually "interstate," the factors for determining what is an "essential function" of the bus driver position would also allow consideration of "the amount of time spent on the job performing the function" of driving interstate routes, "the consequences of not requiring the incumbent to perform the function" of driving interstate routes, and "the current work experience of incumbents in similar jobs" as bus drivers for the City in driving interstate routes. Moreover, the appropriate "individualized assessment" of whether Millage can perform the essential functions of the bus driver position *safely* also involves consideration of whether there are adequate means to control his diabetes, so that the legitimate "safety" concerns that might arise from discovery that he is an insulin-dependent diabetic are effectively mooted by "individualized assessment." *See Kapche,* 304 F.3d at 500.

Consideration of these factors, on an individualized basis, is in keeping with Eighth Circuit precedent regarding disability claims by persons suffering from diabetes. For example, in *Burroughs v. City of Springfield,* 163 F.3d 505 (8th Cir. 1998), the court concluded that a police recruit who knew that his diabetes was controllable and that he was capable of performing the job without any accommodation apart from proper treatment of his diabetes, but who had twice failed to control his diabetes such that he had been unable to function on the job, could not

state a claim under the ADA. Thus, the question in *Burroughs* was not whether or not the police recruit was a diabetic, but whether or not, based on an individualized assessment, he was able to control his condition, considering specifically whether that meant that he could, or could not, perform the essential functions of his job. Similarly, in *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160 (8th Cir. 1998), the court concluded that an employer's legitimate, non-discriminatory reasons for firing a diabetic sales representative were not pretexts for disability discrimination, where the sales representative was excluded from the employer's automobile insurance not by his diabetes, but by his unsafe driving record, and his operation of a company vehicle without a valid driver's license in violation of employer policy. Even supposing that the sales representative's poor driving record was caused by his diabetes, it was the driving record, not the diabetes, that made him "unqualified" for the position.

Upon the record presented here, and an "individualized assessment," there are genuine issues of material fact as to whether or not compliance with the physical requirements of the Federal Bureau of Motor Carrier Safety is really an "essential function" of the bus driver position with the City. As noted above, those requirements are noted in the job description, and the fact that they are included in the job description is by agreement with the union. However, the City concedes that imposition of those requirements was "voluntary," not mandated by either state or federal laws or regulations. Similarly, Millage has presented evidence, primarily consisting of his own affidavit and the affidavit of Jim Marshall, a past president of the local transit union, regarding the number of City bus routes that actually involve interstate transit, and Millage's ability, based on his seniority, to refuse to take such routes on either a regular or "emer-gency" basis. Although it is a close question, the court also concludes that there are genuine issues of material fact as to the extent to which Millage can control his diabetes sufficiently to function safely as a bus driver. On the one hand, there is evidence that he had a reaction sufficiently severe that he had to be removed from his bus, although the incident apparently did not involve any circumstances that would have endangered passengers, as well as other evidence that he could not, and still cannot, control his diabetes—including statements from his doctors at various times that he cannot or should not drive. On the other hand, there is Millage's reading of his medical records, which is not unreasonable on its face, as indicating that he is able to control his diabetes sufficiently to drive a City bus safely, and the evidence that his driving record was satisfactory. These genuine issues of material fact apply to both the "qualification/essential functions" element of Millage's *prima facie* case of disability discrimination and the City's "direct threat" affirmative defense. *See, e.g., Stafne v. Unicare Homes*, 266 F.3d 771, 779 & n. 5 (8th Cir.2001) (explaining that, "Under the ADA, direct threat is listed as a defense to liability," and citing 42 U.S.C. § 12113(a), which allows as a defense the application of "qualification standards ... that screen out ... an individual with a disability" if such a standard is "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation ....," so that "[a] requirement that an employee 'not pose a direct threat to the health or safety of other individuals in the workplace' is an acceptable qualification standard" under 42 U.S.C. § 12113(b)). Moreover, if adherence to the federal safety standards, which bar all insulin-dependent diabetics from certain transit jobs, is not, in fact, an "essential function" of the bus driver posi-

tion with the City, whether or not Millage can obtain a waiver from those requirements under state law is irrelevant.

In short, the court concludes that, at least thus far in the analysis, viewing all the facts in the light most favorable to Millage, and giving him the benefit of all reasonable inferences that can be drawn from the facts, *see Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377, Millage has produced sufficient evidence "such that a reasonable jury could return a verdict for [him]." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allison,* 28 F.3d at 66.

■ *iii. Inconsistent representations of disability.* Perhaps the closest question presented in this case, with regard to whether or not Millage is able to perform the essential functions of his job as a bus driver, is whether or not Millage's application for long-term disability benefits—on the ground that he is purportedly completely disabled from performing his job as a bus driver—bars him from asserting in this litigation that he *is* able to perform the essential functions of his job. As the City points out, this court considered this "judicial estoppel" issue in *Kalskett v. Larson Manufacturing Company of Iowa, Inc.,* 146 F.Supp.2d 961 (N.D.Iowa 2001). In that case, this court explained,

> When an ADA plaintiff declares in a prior sworn statement that she is unable to work and later pursues an ADA claim asserting that she can work, she is obligated to set forth an adequate explanation for the apparent inconsistency between the two positions, otherwise she will be estopped from maintaining the inconsistent position. *See Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). Specifically, in *Cleveland,* the Supreme Court stated:
>
> > When faced with a plaintiff's previous sworn statement asserting "total dis-

ability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807, 119 S.Ct. 1597, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966; *see also Lloyd v. Hardin County, Iowa,* 207 F.3d 1080, 1083 n. 3 (8th Cir.2000) (citing *Cleveland* ).

*Kalskett,* 146 F.Supp.2d at 972.

The court concludes that Millage's explanation that "economic necessity" drove him to apply for long-term disability benefits, based on an averment that he was "totally disabled," when in fact he could perform the essential functions of his job as a bus driver, is not the sort of explanation that would "be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597. Indeed, that explanation does not, in any way, explain, or even address, the apparent inconsistency "with the necessary elements of an ADA claim." *Id.* Instead, it relies on circumstances completely extrinsic to the requirements of the ADA claim, because it has nothing to do, for example, with the elements of such a claim or the way that "disability" is defined under the ADA and under the long-term disability benefits plan.

On the other hand, Millage also proffers as an explanation that, if he was subject to a "blanket exclusion" from his job as a bus driver because of his insulin-dependent diabetes, as the City contends, or if he could not, as a matter of fact, safely operate a bus because of that condition, as the City contends, then he most certainly was "completely disabled" from his job as a bus driver, and properly represented that he was entitled to long-term disability benefits. This proffered explanation comes nearer the mark, even though it is offered here in the absence of any evidence of the specific requirements of the long-term disability benefits plan from either the City or Millage.[4] As this court explained in *Kalskett,* an explanation may be sufficient if it is based on the circumstances or the plaintiff's knowledge at the time that the plaintiff made the statement that is purportedly inconsistent with his or her present contentions. *See Kalskett,* 146 F.Supp.2d at 973–74 (the court found sufficient the plaintiff's explanation that, when she represented that she could not perform production jobs on the line, she was unaware that the company had gone to two-hour rotations on the line, which fit with her medical restrictions). As in *Kalskett,* the court concludes that this explanation presents a jury question, because only the jury may properly assess the weight to be given to an explanation that is facially satisfactory. *Id.* at 974.

Therefore, the City's motion for summary judgment on the ground that Millage is judicially estopped to assert that he is capable of performing the essential functions of his job by prior, purportedly inconsistent statements in support of his application for long-term disability benefits must also be denied.

### III. CONCLUSION

The court concludes that Millage's claims are not barred by the purported untimeliness of his administrative charge. Rather, his administrative charge was timely filed within the applicable 300–day limitations period, and was "initially filed" with the ICRC, even though it was actually first filed with the EEOC, by virtue of the Work–Sharing Agreement between the ICRC and the EEOC, which made each agency the agent of the other for discrimination charges, and by virtue of the operation of applicable statutes, regulations, and decisions. The court also concludes that there are genuine issues of material fact on the only element of Millage's *prima facie* case that is at issue on the City's motion for summary judgment, whether he is "qualified" for his job as a bus driver in terms of his ability to perform the "essential functions" of that job. The court holds that the City cannot rely on a "blanket exclusion" of insulin-dependent diabetics, even if the City has voluntarily incorporated federal regulations that might bar such persons from driving buses interstate, without doing an "individualized assessment" of whether or not Millage is actually able to perform the essential functions of the job or would constitute a "direct threat" to himself or others if he did so. As to such an "individualized assessment," the court concludes that there are genuine issues of material fact. Moreover, the court concludes that there are genuine issues of material fact as to whether Millage has adequately explained apparent inconsistencies between his representations that he is totally disabled from his job as a bus driver, in support of his application for long-term disability benefits, and his present contentions that he can perform the

---

4. The City offers only Millage's application for long-term disability benefits, which contains a representation, without explanation of terms, that "the cause of [Millage's] disability" is "diabetic." Defendant's Exhibit 5, Appendix at 22.

essential functions of the bus driver position.

Therefore, the City's March 10, 2003, motion for summary judgment is **denied** in its entirety.

**IT IS SO ORDERED.**